FRANCISCO BUSÓ-PÉREZ ET AL., Plaintiffs and Appellees, v. MONSERRATE CARRASQUILLO ET AL., Defendants and Appellants.

No. 4131. Argued March 15, 1927.—Decided December 22, 1927.

*González Fagundo & González Jr.* and *Arturo Aponte* for the appelants. *Henry G. Molina* and *Leopoldo Feliú* for the appellees.

Mr. Justice Hutchison delivered the opinion of the court.

Section 935 of the Revised Civil Code, 4031 of the Compiled Statutes, provides that—

"The widower or widow contracting a second marriage shall be obliged to set apart for the children and descendants of the former the ownership of all the property he may have acquired from the deceased spouse by will, by intestate succession, by gift, or for any other good consideration (*sic*) but not his or her half of the conjugal profits."

On October 27, 1901, Doña Isabel de los Santos Pérez y Sánchez made her last will and testament in which she bequeathed to her husband Francisco Busó y Cabrera one-third of all her property after deduction of all claims required by law to be paid therefrom. The will recites that the testator brought nothing to the marriage, that the husband had contributed a farm known as Las Puentes in the municipality of Naguabo, and that the wife during marriage had acquired by inheritance from her father Don Rodulfo Pérez several properties amounting to $9,325.40 in value, more spe-

cifically described in the distributive portion allotted to her in an instrument of partition dated August 25, 1900, and placed in the protocol of the notary Antonio Aldrey y Montolío on September 10th of the same year. Four minor children are then named as sole and universal heirs, three of whom are plaintiffs herein.

Mrs. Busó died in October, 1902, and in June, 1903, a deed of partition was made by an executor named in the will, after citation of the surviving spouse, upon the basis of and in accordance with documents and papers submitted by him, and the appraisal of experts whose report was embodied in the instrument of partition accepted, agreed to and subscribed by the said Busó Cabrera.

Francisco Busó Cabrera in March, 1925, in his own last will and testament refers to his first marriage with Isabel de los Santos Pérez, to the fact of her death and to that of one of the four children above mentioned, states that he had delivered to each of the three remaining children upon their attaining majority the property derived by inheritance from the deceased Isabel de los Santos Pérez in accordance with the provisions of the instrument of partition likewise above mentioned, and enumerates various items of indebtedness said to be due and owing by one of these children. He then sets forth the fact of a second marriage contracted with Monserrate Carrasquillo in September, 1903, and says that he brought to the said second marriage a property named Playa, describing it, which had been appraised at $2,500, its true value, and awarded to him in the division of the estate of the first wife, as a legacy and for the payment of claims against the estate (*para pago de bajas*); that during such second marriage he had developed and cultivated the said property planting coconuts thereon, thereby greatly increasing the value thereof, and that the said increase in value is therefore community property. The wife and five minor children of the second marriage, defendants herein,

together with the three· surviving children of the former marriage, plaintiffs herein, are thereupon named and designated as sole and universal heirs.

Defendants appeal from a judgment in favor of plaintiffs as the sole and exclusive owners of the property in controversy from and after the death of Busó Cabrera in April, 1925, for recovery of possession and for certain instalments of rental accruing from and after the date last mentioned, together with interest thereon and costs, and enjoining defendants from including the said property in a proposed division and distribution of the estate of the said Busó Cabrera.

The first contention of appellants seems to be that due to the confusion arising out of an indiscriminate allotment of various properties to the surviving husband in the instrument of partition first above mentioned, without specification of what particular parcel of land or interest therein was intended to cover outstanding claims which were to be paid by him and what was intended to pass by devise, it is now impossible to identify the land in controversy as the property of plaintiffs, or as reverting to them under the provisions of section 935, *supra*.

Another suggestion is that the court below erred in not finding La Playa to be community property and therefore that only one-half thereof was eligible for allotment by way of inheritance or devise in the division and distribution of the estate of Isabel de los Santos Pérez; and a subsequent assignment further specifies as error the conclusion reached by the trial judge to the effect that defendants, as the heirs of Francisco Busó Cabrera, are estopped to challenge the validity of such division and distribution.

Here the argument for appellants goes beyond the conclusion of law contained in the last will and testament of · Francisco Busó Cabrera and seeks independent support in a deed of conveyance executed by a sister of Isabel de los

Santos Pérez, Doña María Providencia Vicenta Pérez y Sánchez, wife of Don Luis Celis Arquiel, in favor of Francisco Busó Cabrera purporting a sale and transfer of an undivided one half interest in five hundred and twenty-one *cuerdas* of land. This instrument is dated February 5, 1900, and specifies a money consideration of $1,500 acknowledged to have been received by the vendor before the time of the transfer. It recites that the undivided interest in question had been acquired by inheritance from Don Rodulfo Leoncio Pérez y Polanco, father of the vendor, and refers to an instrument of partition at that time pending approval in the District Court of Humacao. On October 12, 1901, Don Luis de Celis Alquier and Francisco Busó Cabrera proceeded to divide the five hundred and twenty-one *cuerdas* into two parcels, one of which, thus apparently acquired by Busó during marriage, is that now said by appellants to be the land in controversy. From this deed we gather that Celis acquired his one-half undivided interest in the five hundred and twenty-one *cuerdas* by purchase from Isabel de los Santos Pérez as shown by instrument No. 38 executed on February 5, 1900, before the notary Antonio Aldrey Montolío, that is to say, of even date with deed No. 39 drawn by the same notary whereby the other sister, wife of Celis, conveyed her undivided interest in the same property to Busó Cabrera. Elsewhere appellants complain of alleged error in the admission of a statement made by Celis as a witness for plaintiffs explanatory of the circumstances surrounding the double transfer by the two sisters of their respective undivided interests, which testimony was objected to by the defendants as an attempt to vary or contradict the terms of a public document.

A third proposition, reverting again to the order of assignment adopted in the brief for appellants, is that the court below erred in not considering a defense set up by defendants to the effect that in the division and distribution

of the estate of Isabel de los Santos Pérez a rural property known as Mabú and acquired by the testator through inheritance from her father at a valuation of $7,734.55 was appraised at $4,500, resulting in a difference of $3,234.55 to the prejudice of the conjugal partnership.

The instrument of partiton dated June 5, 1903, is a remarkably clear, comprehensive and orderly document. It begins with what purports to be an inventory of all property belonging to the deceased wife, to the surviving spouse and to the partnership. Here are listed four parcels of real estate, several head of live stock and other personal property in substance as follows:

1. A rural property named Mabú of a hundred and thirteen *cuerdas,* of record in the name of the deceased wife, and assessed by the appraiser at $4,500;

2. Another rural property called Playa consisting of two hundred and fifty-three *cuerdas* recorded in the name of Francisco Busó Cabrera, and valued by the appraiser at $2,500;

3. A frame house in Humacao standing upon a lot belonging to the municipality recorded in the name of the testator and estimated to be worth $3,000;

4. Another rural property known as Las Puentes consisting of seven hundred and fifty *cuerdas* recorded in the name of Busó Cabrera and assessed at $10,000;

5. A horse named Tabaquillo valued at $75;

6. Another horse Favorito worth $50;

7. Another, Recuerdo, $75.

8. Another, Black, $25;

9. A mare and colt $40, and

10. Three carts and accessories, $125.

Total $20,350.40.

This inventory seems to have been specifically agreed to, accepted and separately signed by all parties concerned, including the surviving spouse Francisco Busó Cabrera.

Next the commissioner named in the will proceeds to outline in a general way the basis upon which the proposed division and distribution of assets is to be made. First, as the self-evident corner stone of this ground work, comes a rehearsal in detail of the contents and provisions of the last will and testament. Next it is pointed out that according to the inventory the property recorded as belonging to Doña Isabel de los Santos Pérez amounts to the sum of $7,500; that of the surviving spouse to $10,000, and the property acquired during marriage to $2,500. Then the property Las Puentes is classified as a separate property of Busó Cabrera, which must be awarded to him as such. Another preliminary consideration is to the effect that inasmuch as Doña Isabel during coverture had inherited from her father property in the sum of $9,325.40, and inasmuch as the parcels appearing as items 1 and 3 of the inventory had been valued at $7,500, therefore enough to cover this difference should be awarded to her out of the community property. Following this the debts, obligations and charges against the conjugal partnership are enumerated thus: A mortgage upon the Playa property in favor of Banco Territorial y Agrícola amounting originally to $1,200 and said to have been reduced to the sum of $600; as cost of pending division and distribution of the estate $100, and as inheritance tax $83.24.

Thereupon the conjugal partnership is liquidated in this wise: Subtracting from the sum total of all the property inventoried $20,350.40, the debts, obligations and charges aggregating $783.24, gives us a net remainder of $19,567.16. The husband brought to the marriage $10,000 and the wife acquired during coverture $9,325.40, all of which deducted from the net remainder last aforesaid leaves a balance of $241.76 as community property (section 1334, Civil Code) to be divided between the surviving spouse and the heirs of Doña Isabel. (Section 1337).

In order to determine the interest of the surviving spouse

it is pointed out that inasmuch as the legal portion of the children consists of two-thirds of the inheritance and out of the other third must come the interest recognized by law as vesting in the husband, which is also the one-third available for disposition by the testator, and inasmuch as the testator had devised and bequeathed to her husband out of all her property the one-third available for testamentary disposition, therefore the surviving spouse appears in a double role with reference to the property so acquired by him, that is to say, as a forced heir and as legatee; and for this reason the award should be made in the capacity last mentioned, thus vesting in him the full ownership by virtue of such devise and bequest. In this connection and anticipating any question of future necessity for deducting from the other two-thirds of the inheritance any interest accruing to the surviving spouse under the law, Busó Cabrera expressly waived any such claim or right and accepted in lieu thereof his legacy.

Basing his action upon these preliminary considerations, thus set forth as prime factors in the situation, the commissioner proceeds to the actual liquidation, division and distribution of the estate substantially and in so far as we are concerned therewith as follows:

### THE COMMON MASS

Consists of all the property listed in the inventory and in existence at the time of the death of Doña Isabel de los Santos Pérez, namely:

### REAL ESTATE

| | |
|---|---|
| The rural property, item 1 of the inventory, at its full value | $4,500.00 |
| Another rural property, item 2 of the inventory, at its full value | 2,500.00 |
| An urban property, item 3, at its full value | 3,000.00 |
| Another rural property, item 4, at its full value | 10,000.00 |
| | $20,000.00 |

### LIVE STOCK

| | |
|---|---:|
| The entire value of the live stock listed as items 5, 6, 7, 8 and 9 of the inventory | 225.00 |

### OTHER PERSONAL PROPERTY

| | |
|---|---:|
| The entire value of the chattels listed as item 10 | 125.40 |
| | $20,350.40 |

### GENERAL DEDUCTIONS

| | |
|---|---:|
| Amount of mortgage held by the Banco Territorial y Agrícola | 600.00 |
| Cost of partition | 100.00 |
| Paid to the Treasurer of Porto Rico, as shown by receipt | 83.24 |
| | $783.24 |

### RESUMÉ

| | | |
|---|---:|---:|
| Amount of property inventoried | | $20,350.40 |
| Amount of deductions | | 783.24 |
| | | $19,567.16 |
| Amount brought to the marriage by Fco. Busó Cabrera | $10,000.00 | |
| Amount acquired by Doña Isabel Pérez Sánchez | 9,325.40 | |
| | | 19,325.40 |
| Balance representing community property | | $241.76 |

### DISTRIBUTION

| | |
|---|---:|
| The one-half of the community property belonging to surviving spouse Fco. Busó Cabrera | $120.88 |
| Id. id. belonging to the heirs of Doña Isabel de los Santos Pérez | 120.88 |
| | $241.76 |

### LIQUIDATION

| | | |
|---|---:|---:|
| Amount of capital belonging to Doña Isabel de los Santos Pérez | $9,325.40 | |
| Her one-half of the community property | 120.88 | |
| | | 9,446.28 |

Dividing this amount into three parts each one-third will equal the sum of $3,148.76.

Legal portion of the children (sec. 796 of the
Civil Code) two-thirds of $9,446.28_____ $6, 297. 52
Amount subject to free disposal of the testator   3, 148. 76
                                          ─────────────   9, 446. 28
Legal portion of each child_____ $1, 574. 38

PROOF

| | |
|---|---:|
| Interest of Fco. Busó Cabrera_____ | $14, 052. 88 |
| Id.   id.   to Fco. Busó Pérez_____ | 1, 574. 38 |
| Id.   id.   to Poncio Busó Pérez_____ | 1, 574. 38 |
| Id.   id.   to Julio Busó Pérez _____ | 1, 574. 38 |
| Id.   id.   to Pablo Busó Pérez_____ | 1, 574. 38 |
| | $20, 350. 40 |

Capital inventoried_____ $20, 350. 40

Then the commissioner proceeds to the apportionment and distribution of the estate, awarding to the surviving spouse property equivalent in value to the amount of the debts, obligations and charges against the estate and imposing upon him the obligation of settling these claims. The distributive portion allotted to Busó Cabrera was formulated and constituted as follows:

INTEREST IN THE ESTATE:

Amount brought to the marriage_____ $10, 000. 00
One-half of community property_____    120. 88
For payment of claims_____    783. 24
Amount of legacy _____:_____  3, 148. 76
                                        ─────────── $14, 052. 88

AWARDS:

The entire ownership of the property Las
Puentes, No. 4 of the inventory, valued at $10, 000. 00
The whole of La Playa, No. 2 of the inven-
tory, valued at_____  2, 500. 00
$1,425.62 out of $3,000.00 appraised value
of an urban property_____  1, 425. 62
$1.86 as a claim against the heirs Francisco,
Poncio and Julio to the amount of $0.62
each _____     1. 86
The chattels listed as item 10 of the inven-
tory _____    125. 40
                                     ─────────── $14, 052. 88

In order to show the valuation placed upon Mabú at the time of acquisition by Isabel de los Santos Pérez, defendants introduced in evidence a portion or fragment of the instrument of partition dated August 25, 1900, and referred to by Doña Isabel in her last will and testament. This document does not purport to be the original instrument of partition, but is a subsequent division or distribution among the parties concerned of certain undivided interests awarded in such original instrument. At the close of the trial counsel for plaintiffs asked for time in which to produce a certified copy of this original and counsel for defendants thereupon admitted that the writing, if produced, would show that the two undivided one-half interests simultaneously disposed of by Doña Isabel and Doña Providencia Pérez on February 5, 1900, were acquired by them by inheritance from their father Rodulfo Leoncio Pérez.

Neither the five hundred and twenty-one *cuerdas* nor the undivided one-half interest therein acquired by Doña Isabel de los Santos Pérez at the time of the original partition is mentioned in the writing of August 25, 1900, and in the absence of any explanation elsewhere in the record, the previous double transfer of February 5th may well be regarded as the most obvious reason for this otherwise curious omission. On the other hand, in addition to the Mabú, valued at $7,734.55, and in order to complete the $9,325.40 referred to in the last will and testament of Doña Isabel de los Santos Pérez and throughout the instrument of partition subsequently based thereon, we find an award of growing sugar cane valued at $1,197.10, another in cash amounting to $143.75, another consisting of an undivided interest in a rice mill estimated at $50, and a fourth consisting of four carts with itemized extra parts and accessories, appraised at $200.

Doña Isabel, before her death, had segregated from the Mabú and sold to the municipality of Humacao a parcel of

five acres and Busó Cabrera was authorized in the deed of partition of the deceased wife's estate to execute a deed in favor of the municipality, but the amount of the proceeds of this sale is neither specified nor accounted for.

It may be, of course, that all of these items were included in one way or another in the frame house, live stock and other personal property listed in the inventory and not specifically classified by the commissioner as community property, nor sought to be so classified by appellants. But that is not the question. The point is that if the surviving spouse at the time of the partition had raised any of the questions now sought to be raised for the first time by defendants herein the facts could have been readily ascertained and substantial justice speedily done to all parties concerned.

If Busó Cabrera had called attention to the fact that his interest in the community property was about to be prejudiced by the proposed method of liquidating the community assets, then the legal representative of the minor children, as well as the three district judges who later approved the division and distribution as made, would have had an opportunity to question the more recent appraisement of the Mabú property and to demand some satisfactory explanation of the extraordinary discrepancy between the two assessments. The other items of separate property above mentioned, having come so recently into the possession of the deceased wife, might have been easily traced, identified and accounted for. The true character of La Playa as the separate property of the testator might have been at once established, in which event apparently there would have been no question as to the existence of any community property or interest therein on the part of the surviving spouse. And if Busó Cabrera had insisted upon the *prima facie* community status of La

Playa, then the heirs with equal or even greater plausibility might have invoked a like presumption *juris tantum* with reference to Las Puentes.

As a matter of fact when one of the older children of the first marriage had attained his majority and a suit was filed to recover an undivided one-half interest in Las Puentes, which in the meanwhile had passed into other hands, Busó Cabrera in his answer denied that during the former marriage he had acquired Las Puentes by purchase with money belonging to the conjugal partnership, from Francisco Busó Baster and as an affirmative defense pleaded the recital or admission contained in the last will and testament of his first wife and alleged that the deed described in the complaint was a mere mask or artificial devise purporting to vest in Busó by conveyance a title actually derived by inheritance from his mother, and that the simulated transfer had been resorted to in order to avoid the costs and complications of a testamentary proceeding. Although this suit was subsequently compromised and some $2,000 was paid in settlement thereof by the defendant then in actual possession of Las Puentes, Busó Cabrera did not challenge the validity or regularity of the division and distribution of the estate of Isabel Pérez, now criticized and questioned but not directly assailed by defendants herein.

The fourth entry in the registry of property with reference to the Playa property set forth the salient features of the last will and testament of Isabel de los Santos Pérez, including the devise to her husband, points out that this property being found among the assets of the testator had been awarded to the surviving spouse in compensation for the obligation assumed by him *"para pago de bajas"* and as a part of this legacy, and informs us that by virtue of these events Francisco Busó Cabrera records the property in his name as having been acquired by testamentary devise *"y para pago de bajas."* As we have already pointed out, the

last will and testament of Francisco Busó Cabrera, executed more than two decades after the making of this entry, proceeds upon the same theory as to the source and character of title.

Theoretically at least, an amount sufficient to satisfy the outstanding claims against the estate was segregated and set apart from the common mass of assets before proceeding to the division and distribution thereof. It is only after the obligation of settling these outstanding claims is assigned to the surviving spouse and assumed by him that he is awarded by way of reimbursement property equivalent in value to the amount of such obligation in addition to what he received as a legatee, as surviving member of the conjugal partnership or as a separate owner.

In the litigation over Las Puentes, *supra*, Busó admitted that the same had been allotted to him as his separate property. That more than three-fourths of all other property awarded to Busó was received by him as a legacy is self-evident. The mere failure on the part of the partitioner or of the notary to foresee and to anticipate the possibility that the property thus acquired by Busó as legatee would become reservable in the event of a second marriage, can not frustrate the operation of section 935 of the Civil Code.

For the purposes of this opinion it may be conceded that Busó even after the alienation of Las Puentes, so long as he remained in possession of the other property above mentioned, was at liberty to say what should be deemed reservable and what would be accepted by him as representing his share of the community property or as compensation for the obligation assumed by him in connection with the outstanding claim against the estate. But we are unwilling to assume with appellants that after disposing of property more than sufficient to cover both the amount of such outstanding claim and the estimated value of Busó's interest in the community property, he would have been permitted

to challenge the character of the only remaining parcel of real estate as a devise under the will notwithstanding the fact that such parcel represented but a fractional part of the legacy.

Section 1043 of the Civil Code provides that—

"A rescissory action by reason of lesion shall prescribe after four years, counting from the time the division was made."

We can not concur in the view that a division and distribution of the estate of a deceased wife made upon the basis of data furnished by the surviving husband, participated in, accepted and ratified by him is open to collateral attack by the surviving wife and children of a second marriage who claim, as heirs and legatees of the said husband, property acquired by him as legatee under the will of the first wife, when it appears that the instrument of partition in question was at most voidable but not void, and the validity thereof is challenged for the first time after the death of the husband long after disposition by him of the bulk of the property received by him as such legatee and distributee and more than twenty years after the date of such division and distribution.

A somewhat more serious question is involved in the fourth proposition relied upon by appellants, to the effect that the court below erred in not finding the increase in value of the Playa property, due to improvements made thereon with money belonging to the subsequent conjugal partnership and expended in drainage operations and the planting of coconuts, to be community property of the second marriage.

Sections 1318 and 1319 of the Civil Code read as follows:

"Sec. 1318. The right to a usufruct 'or pension, belonging to one of the spouses, either in perpetuity or for life, shall form part of his or her own property; but the fruits, pensions, and interest due, during the marriage, shall be partnership property.

"In this provision is included the usufruct which the spouses

508

have in the property of their children, even though they be of another marriage.

"Sec. 1319. The useful expenses made on behalf of the private property of either one of the spouses through advances made by the partnership or by the industry of husband or wife are partnership property.

"Building constructed during the marriage, on land belonging to one of the spouses shall also belong to the partnership, but the value of the land shall be paid to the spouse owning the same."

We are inclined to agree with counsel for appellee that the second paragraph of section 1318 does not refer to any property or present proprietary interest vested in the children of a former marriage in accordance with the terms of section 935, *supra*, prior to the death of the surviving spouse who has contracted a second marriage. Conceding for the sake of argument, without holding, that the surviving spouse of the first marriage, when he remarries, becomes a mere life tenant of the reservable property referred to in section 935, then the character of his estate in the land as a usufruct for life within the meaning of the first paragraph of section 1318 is too plain for argument. We need not speculate therefore at this time as to the purpose and scope of the second paragraph of the section last mentioned.

But, be this at it may, we are constrained to hold that the surviving spouse is not a mere usufructuary or life tenant. The property mentioned in section 935 is not the property of the children and descendants of the former marriage. It is property the legal title to which has already vested in the surviving spouse. The obligation to reserve or set apart the ownership arises only in the event of a second marriage. Nor is the surviving spouse divested of his title by virtue of such subsequent marriage.

Section 937 provides, among other things, that—

"The obligation to set apart shall cease when the children of a marriage, of age and who may have a right to the estate, should expressly renounce it . . ."

Manifestly the law here speaks of a right and of a waiver thereof, not of a vested reversionary interest and a conveyance or transfer of such an interest in the land. Section 938 expressly ordains that—

"The reservation shall also cease if on the death of the father or mother who contracted a second marriage no legitimate children or descendants of the first marriage survive."

Thus it appears that the reservation may or may not ripen into a reversion, and that the legal title remains in the widow or widower of the first marriage subject to a future contingency or condition subsequent which may never occur.

The words *reserva, reservar* and *bienes reservables* are clearly defined by Morell in 4 *Legislación Hipotecaria*, 367.

Sections 939 to 945 inclusive are as follows:

"Sec. 939. Notwithstanding the obligation to set apart, the father or mother, married a second time, may grant betterments in the property to be set apart to any of the children or descendants of the first marriage.

"Sec. 940. If the father or mother should not have made use in whole or in part of the right granted him or her in the foregoing section, the legitimate children and descendants of the first marriage shall succeed to the property to be set apart in accordance with the rules prescribed for succession in the descending line, even if, by virtue of a will, he or she should have unequally inherited from the first deceased spouse or should have renounced or repudiated his or her inheritance. The child, justly disinherited by the father or by the mother, shall lose all right to the property set apart.

"Sec. 941. Alienations of real property to be set apart, made by the surviving spouse before contracting a second marriage, shall be valid with the obligation to secure, from the moment of said marriage, the value of the same to the children and descendants of the first marriage.

"Sec. 942. Alienations of real property to be set apart, which may have been made by the widower or widow after contracting a second marriage, shall be valid only if on his or her death no le-

gitimate children or descendants of the first marriage survive, without prejudice to the provisions of the Mortgage Law.

"Sec. 943. Alienations of personal property, made before or after contracting a second marriage, shall be valid, always reserving the obligation to pay an indemnity.

"Sec. 944. A widower or widow, on contracting a new marriage, shall have an inventory made of all the property subject to be set apart, enter in the registry of property that such real estate is subject to be set apart in accordance with the provisions of the Mortgage Law and shall have the personal property appraised.

"Sec. 945. A widower or widow, on remarrying, is also bound to secure by a mortgage:

"1. The payment of the damages caused, or which may be caused by his or her fault or neglect.

"2. The return of the sums which may have been received for the personal property alienated or the delivery of the value it had at the time of the alienation, if the latter should have been made for a good consideration.

"3. The value of the real estate validly alienated."

After a careful consideration of the question Manresa comes to the conclusion that there is no satisfactory basis in the code for the theory that the surviving spouse upon contracting a second marriage becomes a mere usufructuary and that the children and descendants of the former marriage thereupon acquire a present proprietary interest in the land (VII *Comentarios al Código Civil*, 2nd Edition, page 246); that the right of the surviving spouse so long as he continues in the possession of reservable property is a conditional right which may become absolute and may be even more readily lost; that in the event of survival by children or descendants of the first marriage, an uncertain future contingency or condition subsequent, the right is extinguished (id. page 249); or, as the same thought is expressed at page 251 of the volume last mentioned:

"During the whole period between the inception of the reserve and its extinction, the children or descendants, once that the right which in due time may accrue to them has been assured, have only

an expectation, and therefore they even have no power to transfer that expectation to their heirs.

"The widower is in the first place an usufructuary who shall use or enjoy the things according to their nature, in the form and manner prescribed with reference to usufruct. But, due to the fact that besides being an usufructuary he is, although conditionally, nude owner of the property, he can dispose of it in the way provided by sections 974 to 976."

Morell is even more specific:

"The right of the widower is subject to a resolutory condition; that of the children is subject to a suspensive condition." 4 *Leg. Hip,* Morell, p. 374.

Section 935 of our revised Civil Code as adopted by our Insular Legislature in 1902 began with the words "Besides the reservation imposed by section 799," and the section last mentioned, which was subsequently repealed by an Act of March 8, 1906, laws of that year, page 37, up to the time of such repeal was in terms as follows:

"Sec. 799. The ascendant who inherits property from his descendant, acquired by the latter for a good (sic) consideration from another descendant or from a brother or sister, is obliged to reserve the property he may have acquired by force of law in favor of the relatives within the third degree belonging to the line from which such property originated."

The corresponding articles, 968 and 811, of the Spanish Civil Code have been strictly construed by courts and commentators alike as a limitation upon the free exercise of the rights incident to ownership. And Morell is clearly of the opinion that section 811 of the Spanish Code should be repealed. 4 *Leg. Hip.* p. 381, 389, 390.

In *Edroso* v. *Sablan,* 25 Philippine Reports, 295, the first question raised by the brief for appellant was *"What are the rights in the property of the person who holds it subject to the reservation of article 811 of the Civil Code?"* And the answer may be found in an able exposition by the Philip-

pine court, speaking through Mr. Chief Justice Arellano, be· ginning at page 307 of the volume last above mentioned.

There is no conflict between section 935 and the first para- graph of section 1319 unless an intelligent application of the rule laid down in the paragraph last mentioned would impair the reversionary interest or otherwise prejudice the statutory right of the reservees named in section 935. The first para- graph of section 1319 does not say that the improvements made at the expense of community funds or by the labor and industries of either of the spouses are community property. Much less does it undertake to vest in the community any legal estate in the land upon which such improvements are made. The only privilege conferred upon the community is a right to reimbursement amounting at most, in so far as the property upon which the improvements were made is concerned, to an equitable claim or charge or lien upon the land. The manner of ascertaining the degree of usefulness of the improvements made, or the value of the time and labor expended by either of the spouses thereon, or the sum total of community capital invested therein, in order to de- termine the amount to which the conjugal partnership is en- titled by way of compensation or reimbursement is another matter. The conclusion reached by Manresa upon this as- pect of the question is set forth in 9 *Comentarios al Código Civil,* 2nd Ed. pp. 600 and 601.

Practically the same rule seems to prevail in Louisiana and Texas. Thus in *Babin* v. *Nolan,* 6 Rob. (La.) 508, 514, the Supreme Court of Louisiana said:

"It is clear, that the report of the experts, and the judgment appealed from, are based upon the estimation of the property ac- cording to its value at the time of the marriage; and that the in- crease of the said property was ascertained, not by the difference between the value of the naked land at the time of the dissolution of the community, and its real value with all the improvements ex- isting thereon at the same period, but by that between its value at the time of the marriage, and its valuation at the time that the

experts acted. This is incorrect, as it is obvious, that this mode would necessarily include among the improvements, whatever enhanced value may be derived from the ordinary course of things, from the rise in the value of property, or from the chances of trade. We are at a loss to conceive what difficulty may have been found below, in pursuing the course pointed out by our first judgment. It is very simple resolving itself into the following questions, to be answered by the experts, or by the evidence adduced by the parties.

"First. What was the condition of the property at the time of the marriage?

"Second. What would be the value of such property at the dissolution of the community, in the state in which it was at the time of the marriage?

"Third. What was the real value of the said property, with all the improvements existing thereon, in the condition in which it was at the time of the dissolution of the community?

"Fourth. What is the difference between the two estimates?"

In *Rice* v. *Rice,* 21 Texas Rep. 58, 66, the Supreme Court, speaking through Mr. Chief Justice Hemphill, said:

"But the verdict, so far as it finds the improvements on the lots to be community property, is correct only in a modified sense. They are fixtures, attached to the soil, and cannot in the nature of things be divisible in specie, where one of the joint owners has no interest in the land upon which they have been erected. Hence results the rule, that the community estate must be reimbursed for the cost of buildings erected, by joint labors or funds, upon the separate property of one of the spouses; and, in effect, this vests the improvement in that spouse, and entitles the other to one-half of the cost. This was the positive rule under the Spanish code; and such is the condition and circumstances of this property, that it is divisible only in money, and not in kind. Schmidt, Law of Spain and Mexico, p. 13; 1 White, p. 62. The verdict of the jury, that the improvements are community, need not be disturbed; and further proceedings, if deemed advisable, may be had to ascertain the cost of the buildings."

In *Bond* v. *Hill,* 37 Texas Rep. 626, it is said:

"S. died intestate, leaving a wife and several children. On the partition of his estate between his widow and children, the widow was assigned, among other things, a life estate in the homestead

property, which, it seems, was the separate property of her deceased husband. She subsequently intermarried with the appellant, who moved upon and for some time occupied the property as his homestead, and placed valuable improvements thereon."

The Supreme Court reversed the judgment appealed from and disposed of the technical legal question involved somewhat summarily as follows:

"During the time the premises were thus occupied, Bond put valuable improvements upon the property, and now that Mrs. Bond has departed this life, and the heirs of Silvey are suing for, and by law appear entitled to, the property, the question presented for our consideration is, shall the defendants in error take the property, discharged of all encumbrance for improvements?

"Under the somewhat unsettled condition of many questions growing out of the homestead right (and, indeed, these questions appear to multiply upon the courts, and are often very difficult of solution), Bond may have considered the homestead right of his wife as vesting in him, and indeed, the property, *sub modo,* as belonging to him; and we can not hold him in the light of the ordinary tenant of a particular estate, who makes improvements to encumber the estate of the remainder man.

"In *Dorn* v. *Durham,* 24 Tex. 366, this court placed the right to recover for improvements, made by the holder of the life estate, upon the ground of good faith, and not to depend upon the question of title; and we think this has been the uniform holding of this court.

"The principles of law and equity are so blended in our system that it is sometimes difficult for courts to reach the right disposition of causes, and yet there is a greater latitude allowed to the courts than where the two systems are kept separate. The rigid rule of the common law, that a tenant may not encumber the estate of the remainder men, for improvements, if this were a case in which it must be applied, would, we think, do him injustice. The estate is undoubtedly rendered more valuable to the heirs of James E. Silvey than it would be without the improvements, and what right have they in conscience to claim that their step-father should lose the money he has invested for their benefit? It may be true that these improvements were made during the minority of the appellees, and that they had no voice in them. But perhaps there may be something said on the other side. Were they of note in a court of equity? For it would seem, from the evidence of this case,

that the appellant, during a portion of their minority, stood in the position of a kind and indulgent parent, doing for them whatever his more matured judgment considered just and right.

"We are clearly of the opinion that Bond, the plaintiff in error, has acted in good faith, and that he is entitled, upon every just principle of law and equity, to reasonable compensation for his improvements."

It is fair to add, however, that the same court in *Clift* v. *Clift,* 72 Tex. 144, attempts to draw a line of demarcation between the liability of a remainderman whose rights would be prejudiced if required to reimburse the heirs of a mere life tenant for improvements made by him, and that of a co-owner who loses nothing by reason of a like reimbursement of the heirs of his co-tenants, who have placed improvements upon the property held in common. Upon the point last mentioned the opinion proceeds as follows (italics ours):

"But is the second community estate entitled upon partition to be reimbursed for the money so invested? As to the strip of land now under consideration, Stephen A. Clift, father of appellant, occupies a different position from that held by him as to remainder of the land upon which the building stands. He was a tenant in common with his wife's children of this strip, holding an undivided half interest by fee simple title. This property belonged in common to himself and his first wife, and he was the surviving husband.

"It may be conceded that as a mere tenant in common he could claim nothing for his improvement unless it could be set apart to him by leaving one-half in the value of the land unimproved to his first wife's children; but we may say as to this small piece of ground that it did not admit of any partition. The parties, even in the lifetime of the father, could only have secured their interest by a sale. A sale therefore being necessary to a severance of their interest no reason is seen why the parties who would have been entitled to the property and funds which paid for the house should not have set apart to them from the proceeds of the sale the amount by which the value of the land has been enchanced by such improvement. Since the equities of the appellees may be secured without depriving appellants of any right which they would have

had if the improvement had not been made, we see no reason why it should not be done. Besides we are of opinion that *in the adjustment of equities growing out of the conflicting claims which arise under our community laws we should not be restricted by the rigid rules which apply ordinarily between tenants in common.* See Rice v. Rice, 21 Tex. 66; Furrh v. Winston, 66 Tex. 521.''

The ancient rule, that if a life tenant makes permanent improvements for the comfort and convenience of himself and his family it will be presumed that they were for his own benefit and he can not recover anything from the remainderman or reversioner, is not without its exception and has been somewhat relaxed by later decisions in many cases, as for instance, ''where improvements are necessary by reason of changed conditions, or in order to obtain a reasonable return from property which is unproductive, and the expenditure for such improvements is for the best interests of the remaindermen, as well as the life tenant, and does not contravene the terms of the instrument creating the life estate and the estate in remainder. . . .'' 21 C.J. 953.

In this connection it is interesting to note the prototypes of the two paragraphs of section 1404 of the Spanish Code, corresponding to section 1319 of our own as indicated by Manresa, 9 *Comentarios al Código Civil,* 597, and omitted here in the interest of brevity.

The general rule is prescribed by the first paragraph of section 1319. The second paragraph of that section merely establishes an exception to the general rule and reverses the underlying principle that the accessory follows the principal to the extent and only to the extent of the exception so established. The mere fact that the rule laid down as governing the exceptional case of a building is subversive of the general principle which controls in the application of the broader statutory provision of the first paragraph does not render such principle and provision inconsistent or incompatible with the rights conferred by section 935 upon the children or descendants of a former marriage.

See in this connection 9 Manresa, *Comentarios al Código Civil,* p. 601, where Goyena is quoted with approval as to the theory of this exception to the general rule.

The plain purpose of section 935 first above mentioned is to protect the children and descendants of a former marriage from the disastrous results arising out of the change in parental attitude and affection which human experience has shown frequently follows in the train of a subsequent matrimonial venture. 7 Manresa (2nd edition), 192. Certainly, a surviving spouse who desired to favor the issue of a later union at the expense of the children or descendants of an earlier marriage would not be inclined to convert community funds into permanent improvement upon unproductive reservable real estate in the face of a judicial interpretation of section 1319 excluding such investment from the protection of that statutory provision, and in preference to some equally profitable, and from the viewpoint of the new conjugal partnership, less hazardous transaction. Hence the same consideration which according to Goyena induced the framers of the code to establish the exception to the general rule in the case of buildings erected with community funds should prompt us *a fortiori* to hold that sections 935 and 1319 can stand together. *Urbi eadem ratio, eadem legis dispositio.* In this connection it may be noted in passing that only the building and the ground upon which it stands would need to be included in the proceeding for partition of the estate left by the deceased owner of the reservable property. If the children or descendants of the former marriage, or any of them, should prove to be minors at the time of such partition, the instrument would of necessity be submitted to the competent district court for approval, and in any event the courts which are always open for redress may be depended upon to see that the reservees are well compensated in money or in kind for the loss of such portion of the reservable property as may have been used for a building site. But, be this as it may, and as already pointed out, we

need not hesitate to apply the general rule because of any conjectural doubt as to whether or not the statutory exception to that rule is equally applicable and the question as to the proper course to be pursued in the exceptional case specified in the second paragraph of section 1319 may well be left open for further consideration whenever a final determination thereof may become necessary.

Section 935 makes no mention of improvements. Improvements are not mentioned in any one of the thirteen sections of the Civil Code which purport to cover the entire subject of reservable property. Much less is such property excluded from the operation of the general rule prescribed by section 1319. As already stated, these thirteen sections have been strictly construed in every instance by courts and commentators alike.

Section 1319 speaks of ''the private property of either one of the spouses.'' It creates no exemption in favor of reservable property or of the reservees named in section 935 or elsewhere. The language of section 1318° is perfectly plain. To repeat: ''The right to a usufruct or pension, belonging to one of the spouses, either in perpetuity or for life, shall form part of his or her own property . . .'' Even if the life tenant of reservable property were nothing more than a tenant for life or usufructuary, the question now under consideration might be treated as a case of *lex scripta*. But as we have also shown, such usufructuary, although unquestionably a tenant for life, is likewise the owner of the legal title subject only to a condition or subsequent contingency which may or may not ripen into a reversion.

We need not, however, rest our decision wholly upon the letter of the statute providing for reimbursement of the conjugal partnership. Whatever doubt could be conjured up out of the silence of the code upon the subject of improvement when made upon reservable property with community funds of the second marriage is at once dissipated by the

express command of section 7 of the Civil Code which reads thus:

"Any court which shall refuse to render a decision on the pretext of silence, obscurity or unintelligibility of the laws, or for any other reason, shall be held liable therefor.

"When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."

It is well to bear in mind that the surviving spouse who contracts a second marriage does not necessarily and always experience a change of heart and of mental attitude toward the children of the earlier union. The framers of section 935 did not intend to provide a pretext whereby the husband of the second marriage upon becoming estranged from the second wife and her children would be enabled to rob them of any portion of their interest in the community assets. If in the instant case the second wife instead of the husband had departed this life, Busó would hardly have been permitted to protest against being charged as owner of the Playa property with the amount of community funds expended by him thereon, or in the event of difficulty in ascertaining the amount of money so invested, or the value of his time and labor, then with the enhancement in value of such property by reason of the money, time and labor so expended thereon. Nor do we perceive how the death of Busó, whether preceding or following that of the second wife, can operate to divest the second wife and the children of the second marriage of the right expressly conferred upon them by the terms of section 1319.

It is true of course that the title to the Playa property vested in plaintiffs immediately upon the death of Busó and that property therefore forms no part of his estate for the purposes of partition and can not be included in the proceedings for division and distribution of that estate. But sec-

tion 935 does not say that reservable property shall revert to the reservees free from all charge or equitable lien or liability for reimbursement of community funds belonging to a subsequent conjugal partnership which have been used in converting unprofitable and unproductive real estate into a permanent and prolific source of revenue. Nor do we find in that section or elsewhere any satisfactory basis for the imputation of such an intention to our Insular Legislature.

In the case at bar the property in question at the time of the second marriage seems to have been worth not more than $2,500. There is nothing whatever to show whether or not it was assessed for taxes or whether or not, if so assessed, it produced enough to pay the amount of such taxes, or, for that matter, anything at all in the way of revenue. At the time of the trial rental was accruing under an unexpired lease at the rate of $500 per month. Curiously enough neither the value of the property, at the time of the dissolution of the second marriage including the value of the improvements, said to have been made with community funds, say in so far as indicated by the monthly rental accruing as aforesaid under a five-year lease, nor what the value of the land would have been without such improvements was disclosed by the evidence adduced at the trial. There is some conflict in the evidence as to the number of coconut trees standing upon the property at the time of the second marriage and the proof as to the amount of money, time and labor expended by the surviving spouse after the date of such second marriage, as to the extent and character of the drainage operations in question and as to the area actually planted in coconuts is somewhat meager and unsatisfactory. Nevertheless, the enormous increase in value is self-evident and in the total absence of anything to show that any part or portion of such increase is due to lapse of time or to any general enhancement in value of coconut land, the same must be attributed to the reclamation and development of the new acreage which is now in full production,

and which even from the viewpoint most favorable to plaintiffs, approximately doubled the size of the original grove. The existence of such original grove is left more or less shrouded in doubt by the uncorroborated and unpersuasive testimony of a single witness for plaintiffs who is indirectly discredited by the description contained in a deed of conveyance to which he was a party, placed in an unenviable position on cross-examination and flatly contradicted by several witnesses for defendants. In the circumstances, and in the absence of any finding by the court below, we are unable to avoid the conclusion that the increase in value of the Playa property is due entirely to the time, labor and money expended by Busó Cabrera after the date of his second marriage in draining the land and in planting coconuts thereon.

We are not concerned at this time with the well known rule governing the question of permanent improvement placed by one person upon the lands of another in the absence of any controversy as to title or incidental elements of good faith, nor for that matter with the case of the surviving spouse who invests his separate funds in reservable property either before or after contracting a second marriage. If in the instant case, for example, Busó Cabrera had invested the proceeds from the sale of the Mabú in the development of the Playa property, but without contributing his own time and labor thereto, then the wife and children of the second marriage would have no claim for reimbursement out of rentals accruing after the death of Busó or otherwise and the position of plaintiffs would be unassailable. But in the face of the plain provision of section 1319 there can be no legal presumption that a surviving husband who makes improvements upon reservable property at the expense of community funds belonging to a second marriage intends that in the event of his death the surviving wife and the children of the second marriage shall be deprived of all right to reimbursement by the reservees for the sums so expended. And if there were any such presumption *juris tan-*

*tum* it would have been more than overcome in the instant case by the unequivocal statement of purpose, intention and understanding on the part of the testator, contained in the last will and testament of Busó Cabrera. Reservees who not only receive many times the actual cost of permanent improvements in increased value and productiveness of the real estate upon reversion thereof but also participate with the wife and children of the second marriage in the division and distribution of the sum total of any reimbursement that may be made can not in equity and good conscience be heard to complain that they are not liable for such reimbursement. To the extent of the actual benefits and advantages so received they stand in the shoes of the deceased owner of the reservable property, as, to all practical intents and purposes, his forced heirs with respect to such property, and to the exclusion of all others.

The mere fact that reservees are not constituted sole and universal heirs of the owner of reservable property who does not survive a subsequent marriage, with the reference to the interest of such deceased owner in the claim for reimbursement of community funds, does not militate against the foregoing conclusion. The Legislature of course might have so provided. On the other hand it might have elected to exclude reservees from all participation in the division and distribution of the amount of such reimbursement. The omission to do either may have been deliberate or inadvertent. The result, if undesirable or unsatisfactory, whether due to oversight or to deliberate design is at most a mere accident or incident, as the case may be, of the law of descent and distribution which can not affect the question now under consideration. The statutory requirement as to reimbursement of community funds expended in useful improvements made upon the separate property of either of the spouses contemplates and finds the principal reason for its existence in the fact that upon dissolution of the conjugal partnership the improvements in question inure to the sole

and exclusive use and benefit of such separate property. These improvements revert with the land, but the hereditary portion of the reservees in the remainder of the estate left by the reservor forms no part of such reversion. If the Legislature had seen fit to exclude reservees from all participation in the division and distribution of community assets of the second marriage at the death of the reservor, such exclusion, however unfair or unjust it might be, could not be regarded as an impairment of the statutory right of reversion.

The judgment appealed from must be reversed in part, affirmed in part without modifications, modified in part (within the limitations imposed by the data before us and by the absence of any prayer on the part of defendants for affirmative relief), and as modified affirmed with reference to the portion so modified,—all without prejudice to further proceedings below not inconsistent herewith and without special pronouncement as to costs.